J. S64032/15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ADOPTION OF: R.J.V., JR., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: R.J.V., SR., FATHER | : | |
| | : | No. 1080 MDA 2015 |

Appeal from the Decree June 8, 2015,
in the Court of Common Pleas of Luzerne County,
Orphans' Court, at No(s): A-8243

BEFORE: FORD ELLIOTT, P.J.E., WECHT, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED NOVEMBER 09, 2015**

R.J.V., Sr. ("Father") appeals from the decree entered June 8, 2015, in the Court of Common Pleas of Luzerne County, which involuntarily terminated his parental rights to his minor son, R.J.V., Jr. ("Child").[1]  We affirm.

This appeal arises from the petition for involuntary termination of parental rights filed by Father's sister, A.V., and her husband, G.V. (collectively, "Appellees"), on August 25, 2014.  Child was placed in the care of Appellees a few days after his birth, in November of 2013.  N.T., 2/23/15, 10-11.  While the circumstances surrounding Child's placement with Appellees are not clear, the record indicates that Child was the subject of a

---

[*] Former Justice specially assigned to the Superior Court.

[1] The parental rights of Child's mother, T.M.S. ("Mother"), were terminated by a separate decree entered June 10, 2015.  Mother is not a party to the instant appeal.

dependency action. *Id.* at 12. Child's dependency action was discontinued by order dated March 4, 2014, and legal and physical custody of Child was awarded to A.V. *Id.* As discussed in greater detail, *infra*, Father resided with Appellees for a period of time in June and July of 2014. *Id.* at 14. Father was incarcerated in July of 2014. *Id.* He was released several weeks later, but again was incarcerated in October of 2014. N.T., 2/23/15, at 17, 31; N.T., 3/30/15, at 69. Father currently is serving a sentence of two to four years' incarceration. N.T., 3/30/15, at 70.

A termination hearing was held on February 23, 2015, March 30, 2015, and April 8, 2015, during which the orphans' court heard the testimony of A.V., G.V., Mother, Father, and the mother of A.V. and Father, G.E. ("Paternal Grandmother"). Following the hearing, on June 8, 2015, the court entered its decree terminating Father's parental rights involuntarily. Father timely filed a notice of appeal on June 22, 2015, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Father now raises the following issue for our review. "Whether the trial court erred in finding that Appellees met their burden to prove the elements of termination with respect to 23 Pa.C.S.A. §§ 2511(a)(1) and § 2511(b), through clear and convincing evidence?" Father's Brief at 6 (some capitalization omitted).

Father argues that his parental rights should not have been terminated because he has done everything in his power to maintain a relationship with Child. *Id.* at 13. According to Father, he had regular contact with Child during the times that he was not incarcerated. *Id.* Father contends that he sent letters and gifts to Child while he was incarcerated, and requested visits at the jail, which A.V. refused to permit. *Id.* at 13-15. Father states that that he had "no meaningful resources" available to him while incarcerated that would have allowed him to build a close relationship with Child. *Id.* at 14-15. Finally, Father points out that nearly two months elapsed between the time of the termination hearing and the time the orphans' court entered its termination decree. *Id.* at 15. Father suggests that "this time lapse . . . indicates that the [orphans' c]ourt's grant of Appellees' petition was not based on clear and convincing evidence, and should be reversed." *Id.* at 15-16.

We consider Father's claim mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that

often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (alteration, citations, and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights pursuant to Sections 2511(a)(1) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

J. S64032/15

* * *

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

We first address whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(1). To meet the requirements of this section, "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citation omitted). The court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before analyzing Section 2511(b). *Id.* (citation omitted).

This Court has emphasized that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child." *In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citation omitted). Rather, "[p]arental duty requires that the parent act affirmatively

- 5 -

with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id.* (citation omitted). Critically, incarceration does not relieve a parent of the obligation to perform parental duties. An incarcerated parent must "utilize available resources to continue a relationship" with his or her child. *In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012) (discussing *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975)).

During the termination hearing, A.V. testified that Child has lived almost exclusively with her and G.V. since his birth in November of 2013, and that they care for Child and meet all of his needs.[2] N.T., 2/23/15, at 11; N.T., 3/30/15, at 11-12; N.T., 4/8/15, at 43-45. A.V. currently goes to school three days per week, during which time Child is cared for by A.V.'s aunt or by Paternal Grandmother. N.T., 2/23/15, at 24.

A.V. explained that Father was incarcerated for approximately two months starting in February or March of 2014. N.T., 4/8/15, at 60. Father then resided in Appellees' home with Child from the end of June 2014 until early July 2014, when he again was incarcerated.[3] N.T., 2/23/15, at 14.

---

[2] Child resided with Mother at a facility called Gaudenzia House for eight days in February of 2014, but then was returned to the care of Appellees. N.T., 2/23/15, at 11; N.T., 3/30/15, at 7-8.

[3] A.V. noted that Father and Mother also resided at Appellees' home for a period of time prior to Child's birth. N.T., 3/30/15, at 9.

Father would hold Child and play with Child. *Id.* at 14, 37. However, Father never fed Child, changed his diaper, bathed him, or assisted Appellees financially.[4] *Id.* at 14, 15; N.T., 4/8/15, at 65. Father never asked to babysit Child, nor did he ask how to care for Child. N.T., 2/23/15, at 36-37. Moreover, A.V. indicated that Father "wasn't always there," even when he resided in Appellees' home. *Id.* at 14. A.V. stated, "[a]s soon as [Father] wakes up, he gets on his phone and goes about his day and goes and will come back to the house later, take a shower, get changed, eat and just [go] to sleep." *Id.* at 15.; *accord* N.T., 4/8/15, at 65.

According to A.V., Father was released from incarceration later in July of 2014. N.T., 2/23/15, at 17. Father stayed at motels and with friends, but continued to come to Appellees' home for food and clean clothing. *Id.* During that time, Father "hardly acknowledged" Child. *Id.* at 18. After an incident during which Father "got really loud and verbal," A.V. no longer permitted Father to enter her home or visit Child. *Id.* at 18, 31. A.V. recalled that Father was "on the run, on drugs and suicidal." *Id.* at 31; N.T., 4/8/15, at 63. Father was incarcerated again in approximately October of 2014. N.T., 2/23/15, at 31.

---

[4] Similarly, G.V. testified that Father would hold Child and sit on the couch with him during the time that Father resided at Appellees' home. N.T., 2/23/15, at 46. However, G.V. did not see Father feed Child, change his diaper, or provide Appellees with gifts or money to assist in caring for Child. *Id.* at 47.

With respect to Father's current incarceration, A.V. testified that Father writes to her, and that he "recently" sent letters to her for Child. **Id.** at 18-19. In his letters to A.V., Father requested visits with Child. **Id.** at 32. A.V. declined to bring Child to see Father while he is incarcerated, because "prison is no place for a baby." **Id.** Father calls A.V. collect "quite often," but A.V. does not accept the calls. **Id.**

Father testified that he lived with Appellees "on and off" from Child's birth until June of 2014, and that he sometimes resided with Paternal Grandmother. N.T., 3/30/15, at 65-66, 81, 86. While at Appellees' home, Father would hold Child, play with Child, and feed Child. **Id.** at 66, 86-89. Father conceded that he did not care for Child in any other way, because "I don't have no other kids. I don't really know what to do." **Id.** at 66, 90. Father claimed that Appellees would sometimes leave the home while Child was asleep, and Father was there. **Id.** at 66, 78. Additionally, Father stated that he would play with Child and feed him at Paternal Grandmother's house. **Id.** at 67, 68.

Father explained that he was incarcerated in July of 2014, and was released in the middle of August of 2014. **Id.** at 69. Father went to live with a cousin and also would stay with Paternal Grandmother. **Id.** A.V. did not permit Father to visit her home or see Child during that time. **Id.** However, Paternal Grandmother allowed Father to have surreptitious visits with Child at her home about three times per month. **Id.** at 76. Father

stated that these visits lasted "for a couple hours," and that he occasionally would stay overnight.  *Id.* at 75.  Paternal Grandmother would sometimes bring Child to see Father, and Father would visit Child for twenty minutes to a half hour.  *Id.*

Father acknowledged that he was incarcerated again in October of 2014, and has remained incarcerated ever since.  *Id.* at 69-70.  Father is serving a sentence of two to four years' incarceration, with eight months of credit for time served.  *Id.* at 70.  Father admitted that he will be incarcerated for "at least another year."  *Id.* at 71.  Father claimed that "[t]he whole time through my incarceration, this one and the last time when I was in for a couple months, I always called my mother to see how my son is doing.  And I write letters."  *Id.* at 72.  The majority of these letters were sent to Paternal Grandmother's house, because Father believed that A.V. would not give his letters to Child.  *Id.*  In addition, Father had Christmas gifts sent to Child through a jail ministry.  *Id.* at 71-73.  Father stated that he currently is taking drug and alcohol classes, that he signed up for parenting classes, and that he has been requesting visits with Child at the jail.  *Id.* at 73-74, 88.

Paternal Grandmother testified that Father would visit her home "once in awhile [*sic*]" in 2014, but that he "was hardly ever there."  N.T., 4/8/15, at 8.  Father "would just come and get a shower and leave . . . ."  *Id.* at 9.  Paternal Grandmother initially estimated that three of these visits took place

in 2014, and that they lasted between an hour and two hours. *Id.* at 9-10. Paternal Grandmother later indicated that Father visited her home about ten times in 2014, "but I wouldn't say it was for the baby. He would come for himself and the baby would be there." *Id.* at 24-25. Paternal Grandmother recalled that Father would hold Child and play with him during visits. *Id.* at 9. Father also would feed Child and change his diaper. *Id.* at 10. Father provided items for Child, including diapers, wipes clothing, and toys, "once in a great while." *Id.* at 10, 20. Paternal Grandmother stated that she sometimes would bring Child to see Father wherever he was staying. *Id.* at 24. These visits lasted "for like five minutes," and occurred maybe twice per month. *Id.* Paternal Grandmother also indicated that she took Child to visit with Father "[m]aybe twice" in 2014 for about ten minutes. *Id.* at 37-38. A.V. did not approve of Father visiting with Child, and she became mad at Paternal Grandmother when she found out that visits took place. *Id.* at 40.

Paternal Grandmother further testified that she would speak to Father daily when he was not incarcerated, and that she speaks to him about once per week when he is incarcerated. *Id.* at 21-22. Father always asks how Child is doing. *Id.* at 27. Father has sent about ten letters to Child during his various periods of incarceration. *Id.* at 26-27, 33-35. Paternal Grandmother estimated that Father writes to her three times per week, and writes to Child about twice per month. *Id*. at 37. Paternal Grandmother visits Father at the jail, and he requests visits and pictures. *Id.* at 28.

Based on this testimony, the orphans' court concluded that Father refused or failed to perform parental duties with respect to Child for a period of at least six months prior to the filing of the termination petition on August 25, 2014. Orphans' Ct. Op., 7/21/15, at 8. The court found that A.V. testified credibly that Father did little, if anything, to care for Child during the relevant six months. *Id.* at 4-8, 11-13. In contrast, the court rejected the testimony of Father and Paternal Grandmother concerning parental duties allegedly performed by Father, including feeding Child and changing his diaper. *Id.* at 9-11. The court noted that any efforts made by Father subsequent to the filing of the termination petition, such as sending Child Christmas presents in 2014, could not be considered pursuant to Section 2511(b). *Id.* at 12-13; 23 Pa.C.S. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), . . . the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.").

After careful review, we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Father's parental rights to Child. The court was free to reject the testimony of Father and Paternal Grandmother and to conclude that Father failed to perform parental duties during the relevant period. At best, Father displayed a merely passive interest in Child, by occasionally holding or playing with Child while staying

with Appellees or visiting Paternal Grandmother. Further, Father's most recent incarceration began in October of 2014, after the filing of the termination petition. By law, any efforts made by Father since being incarcerated, such as sending Child letters and requesting visits with Child at the jail, cannot be considered. **See** 23 Pa.C.S. § 2511(b). We also reject Father's claim that the delay between the termination hearing and the entry of the court's termination decree somehow suggests that the court lacked clear and convincing evidence to support its decision. Tellingly, Father cites no authority in support of this proposition. Father is not entitled to relief.

We next consider whether the orphans' court abused its discretion by terminating Father's parental rights under Section 2511(b).[5] We have discussed our analysis under Section 2511(b) as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. **Id.** However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa.

---

[5] While Father does not discuss Section 2511(b) in the argument section of his brief, we will nonetheless consider this issue. **See In re C.L.G.**, 956 A.2d 999, 1010 (Pa. Super. 2008) (*en banc*) (considering Section 2511(b) despite the appellant's failure to challenge the trial court's analysis).

> Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

A.V. testified that Child refers to her as "Mom," and refers to G.V. as "Dada." N.T., 4/8/15, at 46. Child also has a good relationship with Appellees' three biological daughters. *Id.* A.V. explained that she decided to adopt Child so that she and G.V. can provide him with a stable, happy, and healthy life. N.T., 2/23/15, at 40; N.T., 4/8/15, at 47, 54, 56. G.V. agreed that he wants to adopt Child so that he can provide him with "a good life, the life he deserves."[6] N.T., 2/23/15, at 48-49. Paternal Grandmother confirmed that Child loves Appellees and considers them his parents. N.T., 4/8/15, at 22. Child does not have a similar relationship with Father. *Id.* at 22-23.

The orphans' court found that Child's needs and welfare would be served by terminating Father's parental rights. Orphans' Ct. Op., 7/21/15, at 15. The court emphasized that Appellees have cared for Child almost exclusively since his birth and that adoption will provide Child with a permanent home. *Id.* at 13-16.

---

[6] Appellees admitted that they drafted an agreement indicating that Child would be the sole responsibility of A.V. in the event they divorced. N.T., 2/23/15, at 51, 57-58. However, Appellees testified that this agreement was drafted merely to appease Father, that the agreement was never signed, and that they no longer had any intention of signing the agreement. *Id.* at 51-54, 57-59.

We again discern no abuse of discretion. The record indicates that Child is bonded with Appellees, both of whom have been his primary caretakers since birth. Child has no relationship with Father, due to Father's repeated incarcerations and failure or unwillingness to act as Child's parent. Adoption will allow Child to remain part of the only family he has ever known. In contrast, allowing Father to preserve his parental rights would deny Child the opportunity for permanence and stability. No relief is due.

For the foregoing reasons, we affirm the decree of the orphans' court involuntarily terminating Father's parental rights to Child.

Decree affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/9/2015

- 14 -